UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALISHA REGAN,

       Plaintiff,

v.                                                                Case No. 10-10967
                                                                  Honorable Patrick J. Duggan

FAURECIA AUTOMOTIVE SEATING, INC.,

       Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

On March 10, 2010, Plaintiff Alisha Regan ("Plaintiff") initiated this action

against her former employer Faurecia Automotive Seating, Inc. ("Faurecia").  Plaintiff

filed an amended complaint on April 13, 2010, in which she alleges the following counts

against Faurecia: (I) failure to provide a reasonable accommodation for her disability in

violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213; (II) gender

discrimination in violation of Title VII of the Civil Rights Act of 1964; (III) failure to

provide a reasonable accommodation for her disability in violation of Michigan's Persons

with Disabilities Civil Rights Act, Michigan Compiled Laws §§ 37.1201-.1214; and (IV)

gender discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act,

Michigan Compiled Laws §§ 37.2101-.2803.

Presently before the Court is Faurecia's motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56(c), filed November 29, 2010.  The motion has been

fully briefed and on February 7, 2011, this Court issued a notice informing the parties that

it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the Court grants Faurecia's motion.

## I.    Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*,

477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's

evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255,

106 S. Ct. at 2513.

## II.    Factual Background

Faurecia designs, tests, and assembles seats and makes seating components as a

Tier One automotive supplier specializing in automotive seat architecture.  In May 2005,

Plaintiff began working as a temporary contract employee for Faurecia as a Prototype

Seat Builder.  Plaintiff worked in the JIT Prototype Shop ("JIT Shop"), at Faurecia's

facility in Troy, Michigan.

On July 31, 2006, Faurecia hired Plaintiff as a regular, full-time Prototype Seat

Builder.  During most of Plaintiff's employment in this position, there were two other

employees in the JIT Shop: another Prototype Seat Builder and the shop supervisor Rufus

Fortenberry.  The usual work hours for Prototype Seat Builders was 6:00 a.m. to 3:00

p.m., although employees occasionally worked overtime.

When she began working at Faurecia, Plaintiff and her husband lived in Oxford,

Michigan, 24 miles from the Troy facility.  In or around January 2008, Plaintiff and her

husband moved to Perry Michigan, approximately 79 miles from the Troy facility, when

her husband took a new job.

Plaintiff has been diagnosed with narcolepsy.  As described by Plaintiff's treating

physician, Robert R. Reagle D.O., "[n]arcolepsy appears to be a disorder of the part of the

brain that controls sleep and wakefulness."  (Pl.'s Resp. Ex. 2 ¶ 6.)  Typically, narcolepsy

3

is "defined by constant sleepiness and a tendency to sleep at inappropriate times . . . a person with narcolepsy suffers sleep attacks as well as continual sleepiness and a feeling of tiredness that is not completely relieved by any amount of sleep." (*Id.* ¶ 5.) When Plaintiff first began seeing Dr. Reagle in late November 1997, "[she] complained of increasing difficulty with sleep and fatigue; falling asleep at inopportune times such as work and school; reduced energy levels; difficulty in concentrating; being forgetful and irritable; and accidents related to sleepiness in which she had driven off the road." (*Id.* ¶ 8.)

Plaintiff underwent a sleep study and a multiple latency test as part of her treatment with Dr. Reagle. Plaintiff's sleep study was normal; however, her multiple latency test was positive for "sleep onset REM periods." (*Id.* ¶ 9.) Plaintiff's average sleep latency was 2.5 minutes (meaning she fell asleep within 2 ½ minutes of being asked to take a nap), whereas normal is greater than 10 minutes. (*Id.*)

Dr. Reagle has treated Plaintiff's narcolepsy with medication and, since at least 1999, she has been taking Ritalin and Provigil. (*Id.* ¶ 10.) Dr. Reagle indicates that this medications "has been helpful" (*id.*), and that with the medications, "most of [Plaintiff's] symptoms have improved." (Pl.'s Mot. Ex. 3.) According to Plaintiff, Ritalin and Provigil alleviate the sleepiness caused by her narcolepsy. She does not fall asleep without any warning, has not fallen asleep when driving since 1997, and wakes up feeling refreshed. (Def.'s Mot. Ex. 1A at 109.) Plaintiff testified during her deposition in this case that she has fallen asleep while working at Faurecia only once while sitting at her

4

computer.  (*Id*. at 110.)  Plaintiff does, however, routinely nap during her lunch hour.
(*Id*.)  She does not suffer from hallucinations as a result of her narcolepsy, and has never
had sleep paralysis or cataplexy.  (*Id*. at 110-11.)

Plaintiff also testified during her deposition that, since moving to Perry, she
generally retires to bed at 8:00 p.m. (*Id*. at 113.)  She leaves the house around six to eight
hours later to drive the 79 miles to the Troy facility, which she claims could be between a
two to four hour commute depending on the weather.  (*Id*., 154.)

Plaintiff informed JIT Supervisor Fortenberry of her narcolepsy before she
obtained her initial temporary position at Faurecia.  Faurecia's Human Resources
Manager Debby Vargo also was aware of Plaintiff's narcolepsy.

In Summer 2008, Faurecia obtained a new truck for the JIT Shop which only could
be operated by employees with a chauffeur's license.  In order to obtain the chauffeur's
license, the JIT Shop employees (Plaintiff, the other Prototype Seat Builder Mike
Czerwonka, and supervisor Fortenberry) were required to undergo a Department of
Transportation physical and drug screen.  Czerwonka and Fortenberry failed the drug
screen; Concentra refused to qualify Plaintiff for the license due to her narcolepsy.
Plaintiff admits that her disqualification for the license did not impact her job (*see* Def.'s
Mot. Ex. 1A at 124-25); however Faurecia terminated the remaining JIT Shop employees
because they failed the drug test.

Faurecia's Director of Engineering Shared Services, Tina Stuart, and the
supervisor of its Trim Shop, Gunn Hurite, interchangeably supervised the JIT Shop on a

5

temporary basis to fill the void left by Fortenberry's departure. While working in the JIT Shop, Stuart had the opportunity to observe more closely the flow of materials and the seat assembly process. (Def.'s Mot. Ex. 1B at 155, 172.) She determined that the hours JIT Shop employees were working (6:00 a.m. to 3:00 p.m.) was not productive as materials from the various engineering departments would not yet have arrived and people in those departments worked a later schedule. (*Id*. at 155-56, 158, 160-61, 172.) Stuart therefore decided to change the JIT Shop's standard working hours to 7:00 a.m. to 4:00 p.m. (*Id*. at 155-56; Ex. 6.) Stuart also assigned Hurite as the supervisor over the JIT Shop on a formal basis, along with his regular duties supervising the Trim Shop.

In the meantime, Darrin Garrison was hired to fill the Prototype Seat Builder position left vacant when Czerwonka was terminated. On September 10, 2008, Stuart informed Plaintiff that Hurite would be her new supervisor. On September 12, 2008, Hurite informed Plaintiff that the JIT Shop hours would be moved to 7:00 a.m. to 4:00 p.m., effective September 29, 2008. Garrison began working on September 22, 2008, and he was informed that his hours would be 7:00 a.m. to 4:00 p.m.

Before the new work schedule took effect, Plaintiff met with Hurite and Stuart to inform them that her narcolepsy made it difficult for her to work the new hours because she would be making her commute in heavier traffic. As Plaintiff explained during her deposition, she gets tired more quickly driving in high volume traffic and because the drive takes longer as a result of the heavier traffic, she needs to pull over and rest during the trip. Plaintiff therefore requested that she be allowed to continue working the 6:00

6

a.m. to 3:00 p.m. shift or to work through her lunch hour and leave at 3:00 p.m.  Stuart

told Plaintiff that Plaintiff could apply for Family Medical Leave Act ("FMLA") leave or

quit.

Plaintiff went to Human Resources Manager Vargo and similarly reported that she

could not work the new 7:00 a.m. to 4:00 p.m. schedule.  Vargo reiterated that Plaintiff's

options were to go on FMLA or quit.  According to Vargo, she gave Plaintiff FMLA

paperwork and told her that if a medical condition was the cause of her inability to work

the new schedule, she should complete the paperwork so Faurecia could go over it and

better discuss any pertinent restrictions and possible accommodations.  (Def.'s Mot. Ex.

1C at 104, 106-07.)

Plaintiff claims that she thereafter brought a note from Dr. Reagle to Stuart, Hurite,

and Vargo.[1]  (*Id*. Ex. 1A at 149-50, Ex. 8.)  This note reads in full:

> Ms. Regan has been under my care for Narcolepsy.  It is in her medical
> interest to minimize her drive time to and from work.  A work schedule of 6
> a.m. to 3 p.m. is recommended.

(*Id*. Ex. 8.)  Plaintiff never completed Faurecia's FMLA paperwork.  On September 29,

2008, when she did not receive a response after submitting Dr. Reagle's note, Plaintiff

submitted her resignation.  (Pl.'s Resp. Ex. 17.) In her resignation letter, Plaintiff

indicates that she is resigning due to the change in her work hours and "the tremendous

---

[1]Vargo, Stuart, and Hurite testified that they never saw this doctor's note.
Nevertheless, for purposes of summary judgment, the Court presumes that Plaintiff did
give the note to them.

consequence" it will have on her narcolepsy.  (*Id.*)

## III.    Applicable Law and Analysis

### A.    Plaintiff's claims under the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA")

Plaintiff alleges in her amended complaint that Faurecia violated the ADA and PWDCRA by failing to accommodate her request to retain her 6:00 a.m. to 3:00 p.m. work schedule after the JIT Shop hours were changed to 7:00 a.m. to 4:00 p.m., or alternatively, that she work through her lunch and leave work early each day.  To prevail on her reasonable accommodation claim under the ADA, Plaintiff must show that (1) she is disabled; (2) that she is qualified for the job with or without reasonable accommodation; and (3) she was denied a reasonable accommodation.  *Penny v. United Parcel Service*, 128 F.3d 408, 414 (6th Cir. 1997) (citing *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996)).  Because the PWDCRA essentially tracks the ADA, resolution of Plaintiff's ADA claim resolves her PWDCRA claim.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 n.3 (6th Cir. 1996)  In its motion for summary judgment, Faurecia argues that Plaintiff cannot satisfy the first and third elements necessary to support her claims.

First, Faurecia argues that Plaintiff is not disabled within the meaning of the ADA.[2]

---

[2]The PWDCRA's definition of "disability" mirrors that of the ADA and the Michigan courts examine federal law for guidance in determining whether an individual is disabled for purposes of the state's statute.  *Chmielewski v. Xermac, Inc.*, 457 Mich. 593, 605, 580 N.W.2d 817, 821-22 (1998).  Thus if Plaintiff is not "disabled" under the ADA, she cannot prevail on her PWDCRA claim as well.

As relevant to Plaintiff's claims, the statute defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C.A. § 12102(2)(A). A disability that affects, but does not substantially limit, a major life activity is not a disability under the ADA.  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 564-65, 119 S. Ct. 2162, 2168 (1999).  The Sixth Circuit has provided the following definition for the term "substantially limits":

> "Substantially limits" is defined in terms of a general population. The DOJ [Department of Justice] regulation states that an individual is substantially limited "when the individual's important life activities are restricted as to the condition, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R., pt. 36, App. B; *see also* 29 C.F.R. § 1630.2(j) (EEOC definition under Title I of "substantially limits"; defining an individual as substantially limited, for most purposes, if he is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"). Thus, the ADA compares the performance of an individual who alleges a restriction in a major life activity to that of "most people."

*Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 626-27 (6th Cir. 2000).

The determination of whether an individual is substantially limited in a major life activity is an individualized inquiry.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S. Ct. 2139, 2147 (1999).  In other words, "'[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.'" *Id*. (quoting 29 C.F.R pt. 1630, App. § 1630.2(j) (1998)).  Furthermore,

corrective measures that the plaintiff has employed, such as medication, must be considered when determining whether an ADA plaintiff suffers a substantial limitation. *See Sutton*, 527 U.S. at 471, 119 S. Ct. 2139.[3]

Plaintiff claims that she is substantially limited in the major life activities of driving and sleeping as a result of her narcolepsy. Plaintiff relies heavily on Dr. Reagle's affidavit to demonstrate the effects of her narcolepsy on these activities. Dr. Reagle's affidavit, however, sets forth the common symptoms of narcolepsy rather than the specific effects experienced by Plaintiff or he describes the symptoms Plaintiff experienced before her narcolepsy was treated with Ritalin and Provigil. Further, he states that Plaintiff admitted to cataplexy-like symptoms and hallucinations and that increased traffic triggers cataplexy; however, Plaintiff specifically testified during her deposition that she has never experienced cataplexy or hallucinations.[4]  (Def.'s Mot. Ex. 1A at 110-111.)

---

[3]Following *Sutton*, Congress amended the ADA and expressly rejected the Supreme Court's instruction that courts must consider the effects of all ameliorative medications and devices when determining whether a plaintiff is disabled under the ADA. Amendments Act of 2008, Pub.L. No. 110-325, § 3(4)(E)(i), 122 Stat. 3553 (2008). ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as ... medication"). Nevertheless, the Sixth Circuit has held that the 2008 amendments, effective January 1, 2009, do not apply retroactively. *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562 (6th Cir. 2009).

[4]Dr. Reagle also states in his affidavit that "at that time" (i.e. somewhere between November 20, 1997 when he first started seeing Plaintiff and 1999 when she started taking Ritalin and Provigil), Plaintiff's 6:00 a.m. to 3:00 p.m. work schedule was set up so that she would not be driving in traffic. (Pl.'s Resp. Ex. 2 ¶ 12.) However, these were
(continued...)

As indicated earlier, a determination of whether an individual suffers from a disability that substantially limits a major life activity must be made on an individualized basis and take into account any ameliorative measures. According to the evidence, Plaintiff's narcolepsy is well-controlled by medication such that she sleeps 6 to 8 hours a night, wakes up feeling well rested, does not fall asleep while driving or without notice, and except for taking naps during her lunch hour, has only fallen asleep one time during the workday. Therefore, Plaintiff's symptoms as a result of her narcolepsy are far less severe than those suffered by the plaintiffs in the two cases on which she relies: *Waters v. Fred Meyer Stores, Inc.*, No. 08-322, 2009 WL 1874271, at *6-7 (D. Or. June 26, 2009) (describing the plaintiff's symptoms from narcolepsy to include, among others: falling asleep when she sits down for a minute; becoming physically ill with severe nausea, dizziness, and headaches, and throwing up, losing her balance, and staggering if she sleeps less than eleven or twelve hours a night; falling asleep in social settings or in public; daily drowsiness; and an inability to perform physical activity two days in a row); *Hill v. Kellogg USA, Inc.*, No. 8:02-436, 2005 WL 1994944 (D. Neb. Aug. 11, 2005) (describing the plaintiff as being unable to wake from sleep when he wants to and being overcome by fatigue, weakness, and the need to sleep, even when medicated). In short, although Plaintiff's narcolepsy may cause her to have different driving and sleeping abilities than

---

[4](...continued)
the JIT Shop's regular work hours when Plaintiff began working at Faurecia in May 2005 and Plaintiff has never received any formal driving restrictions as a result of her narcolepsy. (Def.'s Mot. Ex. 1A at 41-42, 115-16.)

the average person, it does not substantially limit those– or any other– major life activities

to the degree necessary to qualify her as disabled under the ADA or PWDCRA.

Even if Plaintiff is disabled, Faurecia also argues that she is not requesting a

reasonable accommodation for her disability.  Faurecia contends that Plaintiff simply is

requesting an altered work schedule to make her commute easier.  This, Faurecia argues, is

not required under the ADA or PWDCRA.

The ADA requires an employer to make "reasonable accommodations to the known

physical or mental limitations of an otherwise qualified individual with a disability who is

an applicant or employee, unless such covered entity can demonstrate that the

accommodation would impose an undue hardship on the operation of the business of such

covered entity."  42 U.S.C. § 12112(b)(5)(A).  The statute defines "reasonable

accommodation" as follows:

> (A) making existing facilities used by employees readily accessible to and
> usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to
> a vacant position, acquisition or modification of equipment or devices,
> appropriate adjustment or modifications of examinations, training materials
> or policies, the provision of qualified readers or interpreters, and other
> similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Courts have interpreted this definition as requiring only those accommodations that

"extend[] to job-related adjustments or modifications."  *See, e.g., Brookins v. Indianapolis*

*Power & Light Co.*, 90 F. Supp. 2d 993, 1003 (S.D. Ind. 2000); *Salmon v. Dade Cnty. Sch.*

12

*Bd.*, 4 F. Supp. 2d 1157, 1163 (S.D. Fla. 1998) ("While an employer is required to provide reasonable accommodations that eliminate barriers *in* the work environment, an employer is not required to eliminate those barriers which exist *outside* the work environment.") (emphasis in original). As the Equal Employment Opportunity Commission's implementation guidelines provide, in relevant part:

> The obligation to make reasonable accommodation is a form of non-discrimination. It applies to all employment decisions and to the job application process. This obligation does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability. Thus, if an adjustment or modification is job-related, e.g., specifically assists the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation. On the other hand, if an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide.

29 C.F.R. Pt. 1630, App. § 1630.9.

Thus while the ADA contemplates modifications to an employee's work schedule to remove *job-related* barriers, *see* 42 U.S.C. § 12111(9)(B), such modifications are not required when they only eliminate barriers *outside* the work environment. For this reason, several courts have found no violation of the ADA based on the plaintiff's claim that her employer failed to provide an accommodation that would impact the plaintiff's commute, only. For example, in *Laresca v. American Telephone and Telegraph*, 161 F. Supp. 2d 323 (D.N.J. 2001), the court agreed with the employer "that the change to the day shift sought by [the p]laintiff is not an 'accommodation,' that it is legally obligated to provide, but is simply a request for an easier, more convenient commute." *Id.* at 333.

13

In *Laresca*, the plaintiff could not drive due to seizures caused by his epilepsy and had to rely on family, friends, and co-workers to drive him to work.  *Id*. at 326.  When the plaintiff's employer moved his shift to 2:00 to 10:00 p.m., he was no longer able to get a ride and could not utilize public transportation.  *Id*.  The plaintiff asked his employer to move him to the day shift; the employer rejected his request.  The District Court for the District of New Jersey subsequently rejected the plaintiff's failure to accommodate claim, "find[ing] that the change to the day shift sought by [the p]laintiff was in essence a commuting problem, which [his employer] was not legally obligated to accommodate."  *Id*. at 335.

The district court in *Laresca* relied on other cases reaching the same result.  For example *Bull v. Coyner*, No. 98-7583, 2000 WL 224807 (N.D. Ill. Feb. 23, 2000), where it was a hardship for the plaintiff to travel to and from work in the evenings as a result of his vision problems and the employer, although aware of those problems, changed the plaintiff's work schedule so that he was forced to work nights.  *Id*. at *9. The court found no ADA violation, reasoning:

> Accommodations are directed at enabling an employee to perform the essential functions of a job. 29 C.F.R. § 1630.2(o)(1)(ii). Activities that fall outside the scope of the job, like commuting to and from the workplace, are not within the province of an employer's obligations under the ADA. After all, the ADA addresses discrimination with respect to any "terms, condition or privilege of *employment*." 42 U.S.C. § 12112 [emphasis supplied]. Coyner [the plaintiff's supervisor], with full knowledge of [the plaintiff's] vision problems, may have been insensitive or even malicious in requiring him to work at nights. But she had no legally-imposed obligation to be thoughtful and certainly no duty to require her employees to drive [the plaintiff] on company time.

14

*Id*. The District Court for the Southern District of Florida relied on the same reasoning to reject a plaintiff's claim that the school district for which she worked failed to provide a reasonable accommodation by transferring her to a school that afforded her a shorter commute where her back injuries made it difficult for her to sit for long durations. *Salmon v. Dade Cnty. Sch. Bd.*, 4 F. Supp. 2d 1157, 1163 (S.D. Fla. 1998). As did the District Court for the Northern District of Illinois in *Schneider v. Continental Casualty Co.*, No. 95-1820, 1996 WL 944721, at *9 (N.D. Ill. Dec. 16, 1996), in holding that the plaintiff's employer was not required to transfer the plaintiff to shorten her commute. As relevant to the present case, the district court in *Schneider* also reasoned that the employer was not obligated to accommodate a limitation that was "self-imposed" by the plaintiff's choice to live a distance from the workplace. *Id*.

Here, Plaintiff does not claim that the 7:00 a.m. to 4:00 p.m. work schedule creates a barrier to her ability to perform her job as a Prototype Seat Builder. Rather, these new JIT Shop hours impact Plaintiff only by allegedly extending the length of her commute.[5] Plaintiff's commute to and from work is an activity unrelated to and outside of her job and thus this Court agrees with Faurecia that the ADA does not require the company to modify Plaintiff's work hours to accommodate her alleged disability.

Having found that Plaintiff is not disabled under the ADA and that the statute does

---

[5]As Faurecia points out, Plaintiff presents no evidence to support her assertion that traffic is heavier when she would be on the road for a 7:00 a.m. to 3:00 p.m. versus a 6:00 a.m. to 4:00 p.m. shift or, if so, how much additional time would be added to her commute.

not require Faurecia to provide the accommodations that Plaintiff requests, the Court grants summary judgment to Faurecia on Plaintiff's claims alleging a failure to provide a reasonable accommodation in violation of the ADA and PWDCRA.

### B.  Plaintiff's Gender Discrimination Claims Under Title VII and Michigan's Elliot-Larsen Civil Rights Act

Plaintiff alleges that Faurecia discriminated against her on the basis of her gender because it allowed male employees to work through their lunch hour and leave early but denied her request to do so on a regular basis when the JIT Shop hours were moved to 7:00 a.m. to 4:00 p.m.  An employee may establish a gender discrimination claim under Title VII or Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") by offering either direct or circumstantial evidence of discrimination.  *White v. Columbus Metro. Housing Auth.*, 424 F.3d 232, 238 (6th Cir. 2005) (Title VII);  *Sniecinski v. Blue Cross and Blue Shield of Mich.*, 469 Mich. 124, 132, 666 N.W.2d 186, 192 (2003) (ELCRA).  Plaintiff has not presented direct evidence that Faurecia denied her request for a modification of her work hours based on her gender.

To prove her claims through circumstantial evidence, Plaintiff must first establish a prima facie case of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089 (1981)).  If Plaintiff succeeds, Faurecia must "articulate some legitimate, non-discriminatory reason" for its conduct.  *Id.*  If Faurecia articulates such a reason, Plaintiff must present evidence demonstrating that Faurecia's reason was a pretext for

16

discrimination. *Id.* at 414-15 (citing *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1089). "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

To establish a prima facie case of gender discrimination, Plaintiff must show that she (1) is a member of the protected class; (2) was subject to an adverse employment action; (3) is qualified for the job; and (4) was treated differently than similarly situated male employees for the same or similar conduct. *Humenny v. Genex Co.*, 390 F.3d 901, 906 (6th Cir. 2004). Faurecia contends that Plaintiff was neither subjected to an adverse employment action nor treated differently than similarly situated male employees and thus cannot demonstrate a prima facie case of gender discrimination.

An adverse employment action is "a materially adverse change in the terms and conditions of [the] plaintiff's employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). As the Sixth Circuit further provided in *White*: "A 'mere inconvenience or an alteration of job responsibilities' or a 'bruised ego' is not enough to constitute an adverse employment action." 364 F.3d at 797 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). Plaintiff contends that she was constructively discharged when Faurecia refused her request to

17

modify her work hours when the JIT Shop hours were changed to 7:00 a.m. to 4:00 p.m.

A plaintiff claiming "constructive discharge" must present evidence showing that: "1) 'the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit . . ..'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir.1999)). "[T]he constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982); *see also Logan*, 259 F.3d at 569 (applying *Held*). "A claim of constructive discharge requires a determination that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 639-40 (6th Cir. 2010) (quoting *Held*, 684 F.2d at 432).

The change in the JIT Shop hours– which also applied to Garrison, the male Prototype Seat Builder hired to replace Czerwonka– was not a change in Plaintiff's working conditions sufficient to constitute a constructive discharge. The hours were moved only one hour later and the number of hours did not change. A reasonable person in Plaintiff's shoes would not have felt compelled to resign as a result of this modification. Because this Court has concluded that Faurecia was not required to modify Plaintiff's work hours to accommodate her alleged disability, the Court declines Plaintiff's request to follow *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099 (6th Cir. 2008), where

18

the court held that a claim of constructive discharge could be supported by an employer's refusal to provide a reasonable accommodation for a disabled employee.

Moreover, Plaintiff fails to present evidence to show that she was treated differently than similarly situated male employees.  Even if male employees working in other departments and performing other duties are considered, there is no evidence that they were allowed, *on a regular basis*, to work through their lunch hours and leave early. Faurecia has allowed employees to follow this schedule on occasion, such as when the employee had an afternoon appointment.  As Plaintiff acknowledged, she also was granted permission to do this occasionally.

Plaintiff relies on a memo from Faurecia's Vice President of Engineering, Olivier Lecerf, dated June 6, 2000, to argue that other employees were permitted on a regular basis to work the hours she requested.  In this memo, Lecerf outlines the "work hours policy" for Faurecia's engineering employees:

1. Flexible start time: Between 6:00 a.m. and 8:00 a.m.
2. 8 hours worked per day with a one hour lunch between 11:30 a.m. and 12:30 p.m. The quitting time is therefore between 3:00 p.m. and 5:00 p.m., depending on the starting time.  Any extended deviations from the above must be approved by your supervisor and placed in your personnel file.
 . . .

I believe the above to be the minimum required to meet our business needs and hope you see it this way also.

(Pl.'s Resp. Ex. 3.)  On its face, the memo does not prevent Faurecia from establishing work hours within the times listed to best fit a specific department's needs.  Plaintiff

acknowledged that the established work hours for the JIT Shop from the time she was hired until before she resigned were 6:00 a.m. to 3:00 p.m..  There is no evidence, nor does Plaintiff contend, that employees had the option of setting their start time between 6:00 a.m. and 8:00 a.m.  In fact, Czerwonka testified during his deposition that even though the memo was in place when he started working for Faurecia, "[he didn't] think anybody in the shop got away with coming in at seven or eight on a regular basis."  (Def.'s Mot. Ex. 1E at 13.)  Moreover, the undisputed evidence indicates that Lecerf's memo was no longer in effect when the JIT Shop hours were modified in 2008.  (*Id.* at 13-14; Ex. 1C at 21-22.)

Finally, Faurecia presents a non-discriminatory reason for moving the hours of JIT Shop employees to 7:00 a.m. to 4:00 p.m.  Stuart made this change in part because she felt that under the 6:00 a.m. start time, the employees were idle for the first hour while waiting for materials to arrive.  Plaintiff fails to demonstrate that this reason was a pretext for gender discrimination.

**IV.   Conclusion**

Based on the evidence presented by the parties, and viewing that evidence in a light most favorable to Plaintiff, the Court concludes that she fails to show that Faurecia refused to provide her with a reasonable accommodation in violation of the ADA or PWDCRA or discriminated against her in violation of Title VII or the ELCRA.

Accordingly,

**IT IS ORDERED**, that Defendant Faurecia Automotive Seating, Inc.'s motion for summary judgment is **GRANTED**.

Dated:March 7, 2011

                    <u>s/PATRICK J. DUGGAN</u>
                    UNITED STATES DISTRICT JUDGE

Copies to:
Courtney E. Morgan, Jr., Esq.
Brian J. Nagy, Esq.
David B. Calzone, Esq.
Bernice McReynolds, Esq.